# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| | |
| **v.** | **CRIMINAL NO.  4:23-cr-00151** |
| | |
| **CLIPPER SHIPPING A.S.,** | |
| **Defendant.** | |

## PLEA AGREEMENT

The United States of America, by and through Alamadar S. Hamdani, United States Attorney for the Southern District of Texas, Steven Schammel, Assistant United States Attorney, and Senior Trial Attorney Kenneth Nelson from the Environmental Crimes Section ("Government"), and the defendant, Clipper Shipping A.S., ("Defendant"), (collectively "Parties") and Defendant's counsel, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, state that they have entered into an agreement, the terms and conditions of which are as follows:

### Defendant's Agreement

1.      Defendant agrees to plead guilty to an Information charging Defendant with a knowing failure to accurately maintain an Oil Record Book on the Motor Tanker ("M/T") Clipper Saturn in violation of the Act to Prevent Pollution from Ships, Title 33, United States Code, Section 1908(a). Defendant, by entering this plea, agrees that it is waiving any right to have the facts that the law makes essential to the punishment either proved to a jury or proven beyond a reasonable doubt. In addition, pursuant to Fed. R. Crim. P. 7(b), the Defendant will waive indictment and plead guilty to a one-count Information to be filed in the United States District Court for the Southern District of Texas. The Information will charge the Defendant with the knowing failure to accurately maintain an Oil Record Book in violation of Title 33, United States Code, Section 1908(a).

2.     The Defendant agrees that this plea agreement will be executed by a person authorized by law and the bylaws of the Defendant to execute agreements on behalf of the Defendant. The Defendant further agrees that it will provide to the Government, prior to entry of this plea agreement, the original resolution from the board of directors (or equivalent written authorization as recognized by law) which gives the authority described above and which authorizes such person to execute the plea agreement on behalf of the Defendant.

3.     The Defendant shall notify the Government within seven (7) business days of the following: any corporate name changes; any purchase or sale of vessels that call or may call at any port or place in the United States, or any other change impacting or affecting this Agreement and the ECP. No change in name, corporate or individual control, business reorganization, change in ownership, merger, change in legal status, sale or purchase of assets, or similar action shall alter the Defendant's responsibilities under this Plea Agreement. The Defendant understands and agrees that it shall not engage in any action to seek to avoid the obligations and conditions set forth in this Plea Agreement.

4.     The Defendant agrees not to take any position, or cause another to take any position, or ask another to submit a position as an amicus curie, on any Government motion which may be filed for payment of fine money, pursuant to 33 U.S.C. § 1908(a) to the person(s) who provided information leading to the imposition of the criminal penalties in this case.

### Punishment Range

5.     The **statutory** maximum penalty for a violation of Title 33, United States Code, Section 1908(a), for an organizational defendant, is a term of probation of not less than one year nor more than five years and a fine of not more than $500,000.00 or not more than the greater of

twice the gross gain or twice the gross loss, whichever is greatest. *See* Title 18, United States Code, Sections 3551(c), 3561(c)(1), 3571(c)(3), (d); and United States Sentencing Guidelines (U.S.S.G.). §8D1.2(a)(1).

### Mandatory Special Assessment

6.   Pursuant to Title 18, United States Code, Section 3013(a)(2)(B), immediately after sentencing, Defendant will pay to the Clerk of the United States District Court a special assessment in the amount of Four Hundred dollars per count of conviction. The payment will be by cashier's check or money order, payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

### Waiver of Appeal and Collateral Review

7.   Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, section 3742, afford a defendant the right to appeal the conviction and sentence imposed. Defendant is also aware that Title 28, United States Code, section 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the judgment of conviction and sentence has become final. Defendant knowingly and voluntarily waives the right to appeal or "collaterally attack" the conviction and sentence, except that Defendant does not waive the right to raise a claim of ineffective assistance of counsel on direct appeal, if otherwise permitted, or on collateral review in a motion under Title 28, United States Code, section 2255. In the event Defendant files a notice of appeal following the imposition of the sentence or later collaterally attacks its conviction or sentence, the United States will assert its rights under this agreement and seek specific performance of these waivers.

3

8.   In agreeing to these waivers, Defendant is aware that a sentence has not yet been determined by the Court. Defendant is also aware that any estimate of the possible sentencing range under the sentencing guidelines that it may have received from its counsel, the United States, or the Probation Office, is a prediction and not a promise, did not induce its guilty plea, and is not binding on the United States, the Probation Office, or the Court. The United States does not make any promise or representation concerning what sentence the defendant will receive. Defendant further understands and agrees that the United States Sentencing Guidelines are "effectively advisory" to the Court. *See United States v. Booker*, 543 U.S. 220 (2005). Accordingly, Defendant understands that, although the Court must consult the Sentencing Guidelines and must take them into account when sentencing Defendant, the Court is not bound to follow the Sentencing Guidelines nor sentence Defendant within the calculated guideline range.

9.   Defendant understands and agrees that each and all waivers contained in the Agreement are made in exchange for the concessions made by the United States in this plea agreement.

### The United States' Agreements

10.   Provided that the Defendant complies fully with the terms of this Agreement, the Government agrees to forgo additional criminal prosecution of the Defendant for any other environmental or related offenses involving the M/T Clipper Saturn that are or may be related to the underlying Information in this matter and/or arise out of the conduct giving rise to the investigation of this matter, occurring before the date of this Agreement and are known to the Government at the time this Agreement is executed. The Defendant understands that this Plea Agreement affects only criminal charges and shall not be construed, in whole or in any part, as a waiver, settlement, or compromise of any remedies available to the United States, or any other

4

(c)     to seek resolution of such factors or facts in conference with Defendant's counsel and the Probation Office;

(d)     to file a pleading relating to these issues, in accordance with section 6A1.2 of the United States Sentencing Guidelines and Title 18, United States Code, section 3553(a); and

(e)     to appeal the sentence imposed or the manner in which it was determined.

### Sentence Determination and Joint Recommendation

13.     The Parties fully and completely understand that this Plea Agreement is submitted to the Court pursuant to Federal Rule of Criminal Procedure **11(c)(l)(C)**. If the Court rejects this Agreement, it is further agreed that the Defendant may withdraw its plea and all of the Parties may withdraw from this Agreement.

14.     The Parties agree that the Court will take into account, but is not bound by, the applicable United States Sentencing Guidelines. The Parties agree that the imposition of a fine is not governed by the U.S.S.G. That is because the offense conduct to which the Defendant is pleading guilty is covered by U.S.S.G. §2Q1.3, "Mishandling of Other Environmental Pollutants; Recordkeeping, Tampering, and Falsification," which is not listed under U.S.S.G. §8C2.1, governing criminal fines for organizations. Accordingly, pursuant to U.S.S.G. §8C2.10, the sentence of a fine is determined by applying Title 18, United States Code, Sections 3553 and 3572.

15.     Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Parties agree that the sentence articulated below is warranted in this case:

(a) A criminal fine in the amount of One Million Five Hundred Thousand Dollars ($1,500,000). The Parties agree that $1,500,000 USD is an appropriate fine pursuant to 18 U.S.C. §§ 3571(c) and (d). Specifically, the Parties agree that the Defendant gained at least $750,000.00 pursuant to 18 U.S.C. § 3571(d).

(b) A term of probation of Forty-eight (48) months in accordance with 18 U.S.C. §§ 3553(a), 3561, and 3562. The period of probation shall include as a condition of probation the implementation of an Environmental Compliance Plan ("ECP") as agreed to

6

civil or administrative remedies, including suspension and debarment, available to the United States by law. In the event that any other local, state, or federal enforcement agency investigates conduct related to this Plea Agreement, the Government agrees to advise said agency of the terms of this agreement and the nature and extent of the Defendant's cooperation under this agreement upon request of the Defendant. The Government acknowledges that Defendant fully cooperated in the investigation.

### Agreement Binding - Southern District of Texas and Environmental Crimes Section Only

11.    The United States Attorney's Office for the Southern District of Texas and the Environmental Crimes Section of the Department of Justice further agree that they will not further criminally prosecute Defendant in the Southern District of Texas for offenses arising from conduct charged in the information. This plea agreement binds only the United States Attorney's Office for the Southern District of Texas, the Environmental Crimes Section, and Defendant.   It does not bind any other United States Attorney's Office. The United States Attorney's Office for the Southern District of Texas and the Environmental Crimes Section will bring this plea agreement and the full extent of Defendant's cooperation to the attention of other prosecuting offices, if requested.

### United States' Non-Waiver of Appeal

12.    The United States reserves the right to carry out its responsibilities under guidelines sentencing.    Specifically, the United States reserves the right:

> (a)      to bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

> (b)      to set forth or dispute sentencing factors or facts material to sentencing;

in Attachment A. The Defendant agrees to fully fund the expenses required in the ECP including the cost for audits and monitors. The Defendant may move this Court for early termination of probation, for good cause shown, after thirty-six (36) months. The Defendant agrees that it will specifically contract with the operating company of the vessels listed in the ECP in order to guarantee that the vessels may be accessed and audited during the term of probation.

### Rights at Trial

16.   Defendant understands that by entering into this agreement, it surrenders certain rights as provided in this plea agreement. Defendant understands that the rights of a defendant include the following:

(a)   Defendant would have the right to be charged by Indictment;

(b)   If Defendant persisted in a plea of not guilty to the charges, Defendant would have the right to a speedy jury trial with the assistance of counsel. The trial may be conducted by a judge sitting without a jury if Defendant, the United States, and the court all agree; and

(c)   At a trial, the United States would be required to present witnesses and other evidence against Defendant. Defendant would have the opportunity to confront those witnesses and its attorney would be allowed to cross-examine them. In turn, Defendant could, but would not be required to, present witnesses and other evidence on its own behalf. If the witnesses for Defendant would not appear voluntarily, it could require their attendance through the subpoena power of the court.

### Factual Basis for Guilty Plea

17.   Defendant is pleading guilty because it is in fact guilty of the charge contained in the Information. If this case were to proceed to trial, the United States could prove each element of the offense beyond a reasonable doubt. The following summary of facts, among others, would be offered to establish Defendant's guilt:

At all times relevant to this information, Defendant owned the M/T Clipper Saturn. The M/T Clipper Saturn ("Vessel") was a tanker vessel of over 150 gross

tons and was engaged in the trade of transporting liquid natural gas around the world. The crew onboard the Vessel, during the relevant time period, including the Chief Engineer and Master, acted as Defendant's agents. Their actions were performed within their capacity as Defendant's agents and were intended to benefit Defendant, at least in part.

The Master was overall in charge of the vessel and responsible for numerous documents, including the Oil Record Book ("ORB"). The Chief Engineer was in charge of the engineering department, supervising engineering personnel, and the proper disposal of oily waste generated in the engine room. The Chief Engineer was a person in charge of engine room operations and thus required to make appropriate entries in the ORB without delay.

On vessels like the M/T Clipper Saturn, oily engine room waste, including oily mixtures, sludge, waste oil, and machinery space bilge water, is generated on a regular basis. Oily mixture means a mixture, in any form, with oil content. Machinery space bilge water refers to oil and water that drips and leaks from machinery and mechanical systems and accumulates in the bilge, which is the bottom-most portion of the engine room. Machinery space bilge water is also known as "oily bilge water" and is defined in 33 C.F.R. § 151.05 as "water which may be contaminated by oil resulting from things such as leakage or maintenance work in machinery spaces. Any liquid entering the bilge system including bilge wells, bilge piping, tank tops or bilge holding tanks is considered oily bilge water."

Machinery space bilge water can be disposed of in two manners: (1) it may be processed through the onboard Oily Water Separator and Oil Content Monitor resulting in an overboard discharge of water with no more than 15 parts per million ("ppm") of oil, or (2) it may be disposed of to a barge or other shore-based disposal facility. Prior to processing or disposal, machinery space bilge water must be transferred to, and stored in, the vessel's bilge water holding tank. In order to reduce the overall volume of oily wastes, it is permissible for oily waste to be heated to facilitate the evaporation of water from the waste.

All disposals and transfers of bilge water, including the use of the Oily Water Separator, or transfer to a shore-based facility, must be recorded by the person or persons in charge of those operations in the Vessel's ORB. The Chief Engineer was the person in charge of these operations and required to make accurate entries in the vessel's ORB.

On or about September 27 and October 1, 2021, the Vessel's then Chief Engineer failed to record discharges of oily bilge water in the ORB. The Chief Engineer, without contacting Defendant, authorized these discharges directly into the sea at night while the vessel was anchored near Lomé, Togo. The Chief Engineer at the time directed that contents of the Bilge Water Holding Tank be transferred, using a pneumatic pump, into a gray water tank. Then he ordered that contents of the gray water tank be discharged by removing a section of piping, placing a hose in the gray water tank and attaching the hose to one of two eductors,

9

creating suction in the hose. The piping in the area of the eductors was re-painted to appear that no piping was removed.

On or about October 28, 2021, the Vessel arrived in Houston, Texas. Prior to the Vessel's arrival, the U.S. Coast Guard received information from a former crewmember about the discharges. The U.S. Coast Guard conducted a Port State Control and Expanded MARPOL examination of the Vessel. The inspectors found evidence corroborating the information the crewmember provided. Other crewmembers corroborated the allegations brought forth by the former crewmember. The inspectors examined the ORB and noted that there were no entries documenting the discharges described above. Those discharges were required to be recorded in the ORB. 33 C.F.R. § 151.25(d)(4) & (g).

### Breach of Plea Agreement

18. If Defendant should fail in any way to fulfill completely all of the obligations under this plea agreement, the United States will be released from its obligations under the plea agreement, and Defendant's plea and sentence will stand. If at any time Defendant retains, conceals, or disposes of assets in violation of this plea agreement, or if Defendant knowingly withholds evidence or is otherwise not completely truthful with the United States, then the United States may move the Court to set aside the guilty plea and reinstate prosecution. Specifically, in this case, if Defendant should attempt to avoid its financial obligations under this agreement, for example, by filing for bankruptcy before the fine is paid, the parties agree that doing so would be a breach of the Plea Agreement, and would give the Government the right to immediately seek relief from the court, including the reinstatement of prosecution. Defendant and its agents waive

all defenses based upon the statute of limitations and the Speedy Trial Act as to any charges that are part of the same course of criminal conduct described in the Information. Further, any information and documents that have been disclosed by Defendant, whether prior to or subsequent to this plea agreement, and all leads derived therefrom, will be used against Defendant in any prosecution.

### Restitution

19.   There is no restitution in this case.

### Forfeiture

20.   There is no forfeiture in this case.

### Fines

21.   Defendant agrees that any fine imposed by the Court will be due and payable immediately, and Defendant will not attempt to avoid or delay payment. Subject to the provisions of paragraph 7 above, Defendant waives the right to challenge the agreed fine in Paragraph 15(a) in any manner, including by direct appeal or in a collateral proceeding.

### Complete Agreement

22.   This written plea agreement, consisting of 15 pages, including the attached addendums of Defendant and its attorney, constitutes the complete plea agreement between the United States, Defendant, and Defendant's counsel. No promises or representations have been made by the United States except as set forth in writing in this plea agreement. Defendant acknowledges that no threats have been made against it and that it is pleading guilty freely and voluntarily because it is guilty.

11

23.    The undersigned corporate representative is authorized to enter this Plea Agreement on behalf of Defendant.

24.    Any modification of this plea agreement must be in writing and signed by all parties.

Filed at _Houston_ Texas, on _July 6_____, 20_23_

_____
Defendant

Subscribed and sworn to before me on _____, 20__.

NATHAN OCHSNER, Clerk
UNITED STATES DISTRICT CLERK

By:    _____
Deputy United States District Clerk

APPROVED:

ALAMADAR S. HAMDANI
UNITED STATES ATTORNEY

By:    _____
Steven Schammel
Assistant United States Attorney
Southern District of Texas
Telephone: 713-567-9000
Facsimile: 713-718-3303

**Edvin Endresen**
_____
Corporate Representative
**Clipper Shipping A.S.**

_____ 1/18/2023
Kenneth E. Nelson
Senior Trial Attorney
Environmental Crimes Section
Telephone: 202-305-0435

_____
Philip H. Hilder
Q. Tate Williams
Stephanie K. McGuire
James Rytting
Counsel for **Clipper Shipping A.S.**
Hilder & Associates, P.C.
Telephone: 713-655-911

12

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ' | |
| | ' | |
| v. | ' | CRIMINAL NO. 4:23-cr-00151 |
| | ' | |
| CLIPPER SHIPPING A.S., | ' | |
| Defendant. | ' | |

## PLEA AGREEMENT – ADDENDUM 1
## CERTIFICATION COUNSEL REVIEWED PLEA WITH CLIENT

I have fully explained to Defendant, through its corporate representative, its rights with respect to the pending information. I have reviewed the provisions of the United States Sentencing Commission's Guidelines Manual and Policy Statements and I have fully and carefully explained to Defendant, through its corporate representative, the provisions of those Guidelines which may apply in this case. I have also explained to Defendant, through its corporate representative, that the court may reject the plea agreement if it disagrees with the sentence agreed to by the parties.Further, I have carefully reviewed every part of this plea agreement with Defendant, through its corporate representative. To my knowledge, Defendant's decision to enter into this agreement is an informed and voluntary one.

_____
Philip Hilder
**Counsel for Clipper Shipping A.S.**

Date _____6/22/23_____

13

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ¡ | |
| | ¡ | |
| **v.** | ¡ | **CRIMINAL NO.  4:23-cr-00151** |
| | ¡ | |
| **CLIPPER SHIPPING A.S.,** | ¡ | |
| **Defendant.** | ¡ | |

## PLEA AGREEMENT – ADDENDUM 2
## STATEMENT OF CORPORATE REPRESENTATIVE

As corporate representative, and authorized to act on behalf of Defendant **Clipper Shipping A.S.,** I have consulted with **Clipper Shipping A.S.'s** attorney and fully understand all the rights with respect to the information pending against **Clipper Shipping A.S.. Clipper Shipping A.S.'s** attorney has fully explained, and I understand, all the rights with respect to the provisions of the United States Sentencing Commission's Guidelines Manual which may apply in this case. I have read and carefully reviewed every part of this plea agreement with **Clipper Shipping A.S.'s** attorney. I understand this agreement and I voluntarily agree to its terms on behalf of Defendant **Clipper Shipping A.S..**

_____

**Counsel for Clipper Shipping A.S.**
Corporate Representative

_____6/22/23_____
Date

14

**ATTACHMENT A**
**Environmental Compliance Plan**

PURSUANT TO PLEA AGREEMENT

**United States v. Clipper Shipping A.S.**

The following standards and requirements for an ENVIRONMENTAL COMPLIANCE PLAN ("ECP") have been prepared pursuant to the Plea Agreement between CLIPPER SHIPPING A.S. (hereinafter "CLIPPER") and the UNITED STATES OF AMERICA (hereinafter the "United States" or the "Government")[1] filed in the United States District Court for the Southern District of Texas. Compliance with all of the standards and requirements of the ECP is an essential term of the Plea Agreement and constitutes a special condition of probation.

The ECP includes various provisions to ensure that all vessels listed in this ECP ("Covered Vessels") comply with all applicable maritime environmental requirements established under applicable international, flag state, and port state laws, including, but not limited to the International Convention for the Safety of Life at Sea ("SOLAS"), the International Safety Management ("ISM") Code, the International Convention for Prevention of Pollution from Ships ("MARPOL"), and all applicable Federal and state statutes and regulations, including, but not limited to, the Ports and Waterways Safety Act ("PWSA"), the Act to Prevent Pollution from Ships ("APPS"), the Clean Water Act ("CWA"), and the Oil Pollution Act of 1990 ("OPA 90"), and with the requirements of this ECP. Among the requirements of the ECP are auditing requirements and a Court Appointed Monitor. The Monitor requirement is merited to detect and prevent potential future conduct of the nature described in the Information, the involvement of a shipboard officer in such conduct, and to minimize risk of such future conduct absent an improvement of internal controls. It is further merited by the difficulty law enforcement, regulators, and the probation office encounter in exercising adequate oversight of ocean-going vessels.

The auditing requirements of this ECP apply to the Covered Vessels. CLIPPER will ensure that appropriate contracts are in place with the operator(s) of the Covered Vessels to ensure that the vessels are available for auditing.

The Covered Vessels are:

| Vessel Name | IMO# |
| --- | --- |
| Clipper Jupiter | 9699505 |
| Clipper Mars | 9377078 |
| Clipper Moon | 9253820 |
| Clipper Neptun | 9372432 |
| Clipper Orion | 9372420 |

---

[1] The term "United States" includes the U.S. Attorney's Office for the Southern District of Texas and the Environmental Crimes Section of the U.S. Department of Justice. The United States, together with the U.S. Probation Office for the Southern District of Texas and the U.S. Coast Guard Office of Casualty Investigations & Analysis, are collectively referred to as the "Interested Parties."

| Clipper Saturn | 9699517 |
| Clipper Sky | 9277943 |
| Clipper Star | 9247807 |
| Clipper Venus | 9731042 |

Any Covered Vessel that is sold in a bona fide arms-length transaction and has also changed its operation/management company will be excluded as a Covered Vessel. CLIPPER shall notify the Interested Parties of any change in name, flag of registry, recognized organization, ownership or class society of any Covered Vessel.

## A.    APPLICABILITY/PURPOSE

(1)    This ECP shall cover and apply to CLIPPER's operations and the Covered Vessels as set forth herein.

(2)    This ECP is not intended to replace the ISM Code, or any other applicable international legal requirement or United States statute and regulation.  The purpose of this ECP is to augment the requirements of existing law by increasing and improving inspections, reviews, and audits of the Covered Vessels, increase training of all personnel involved with the Covered Vessels; develop and implement management and engineering controls to better manage, detect and prevent environmental violations; and require periodic reports to the Interested Parties to ensure that the Covered Vessels comply with all applicable maritime environmental requirements established under applicable international, flag state, and port state law and all applicable Federal and state statutes and regulations, and that an effective environmental management system is in place to prevent recurrence of violations.

## B.    COMPLIANCE MANAGER

(1)    Within sixty (60) days of entry of the Plea Agreement, CLIPPER shall designate a Compliance Manager (hereinafter "CM"). DWM shall provide the name of the CM to the Interested Parties.  The CM shall be responsible for coordinating with the Third Party Auditor (hereinafter "TPA"), as more fully described below, developing and implementing all of the procedures and systems required herein, augmenting current training programs for the officers and crew of the Covered Vessels, ensuring that reviews, audits and surveys are carried out as required and ensuring that all documents are properly maintained and that any required reports are made on a timely basis to the Court Appointed Monitor (hereinafter "CAM") and the Interested Parties.  All reports required under this ECP shall be reviewed by the CM and signed under the penalty of perjury.

(2)    The CM shall be authorized to access all records and personnel regarding all Covered Vessels for the purpose of ensuring compliance with the ECP.  The CM shall be authorized to implement all requirements of the ECP on all Covered Vessels.  The CM shall ensure that audits and surveys are carried out as required, that all documents are properly maintained and that reports are made on a timely basis to the Interested Parties and CLIPPER.  The CM position will be filled by an individual(s) with significant maritime vessel operational background, who possesses auditing experience and is thoroughly familiar with the requirements

of this ECP and is knowledgeable about domestic and international maritime environmental laws and regulations.

### CM Responsibilities:

(a)  <u>Development and Maintenance of Effective Training Programs</u>. The CM will be responsible for developing and/or augmenting existing training programs to educate and train employees of the Covered Vessels on their environmental commitment, the requirements of the ECP, the policies and procedures for complying with the ECP, and the possible consequences to CLIPPER and to individuals for failure to comply with environmental laws. The CM shall also make environmental consultants and contractors involved in the operation of Covered Vessels aware of this ECP and its requirements.

(b)  <u>Auditing and Compliance Assessment</u>. Verify that the TPA conducts the review and audits required by the ECP and that the required reports are prepared.

(c)  <u>Fleet Reviews</u>. Supervise annual overall reviews of the environmental compliance program and ''focused'' reviews of key environmental areas to promote the adoption of "best practices."

(d)  <u>Reporting of Non-Compliance by Employees and Crew Members</u>. Evaluate and augment, as needed, the Open Reporting System on the Covered Vessels to ensure that seafarers and shoreside employees may report (anonymously if the employee so desires) issues of non-compliance with this ECP and any other procedure, policy, or regulation associated with environmental protection. The CM shall review, investigate, and document in a timely fashion reports of non-compliance received from employees and shall initiate, monitor, and document all actions taken as a result of such reports. The CM shall maintain records of such reports and action taken and shall make them available for review by the TPA and the CAM.

## C.   MASTER AND CHIEF ENGINEER

(1)    The Master of each Covered Vessel shall ensure that prompt reports are made to the CM of any non-compliant condition associated with environmental protection of any Covered Vessel.

(2)    The Chief Engineer on board all Covered Vessels shall perform the following duties regarding this ECP:

(a)  Daily measure, monitor, record and manage shipboard generated wastes generated by engineering operations;

3

(b)     Report to the CM and cooperate to resolve environmental concerns, such as inoperative or ineffective pollution prevention equipment and document all efforts to do so in a log that is available for review and audit.

## D.   THIRD PARTY AUDITOR

(1)     During the probationary period, a TPA shall conduct the audits and submit the reports described in this ECP. Within sixty (60) days of sentencing, CLIPPER shall submit to the Government a list of three (3) qualified candidates for the TPA position along with its recommendation for approval of one of the candidates, from which the Government will select a candidate to serve as the TPA. To the extent practicable, CLIPPER will endeavor to submit candidates that have not provided auditing services to CLIPPER within the last calendar year prior to the U.S. Coast Guard boarding of the *M/T CLIPPER SATURN* that initiated the investigation which ultimately led to the Plea Agreement in this case, or is not associated with the Classification Societies or Flag Administrations to which the Covered Vessels are classed or registered. In the event that none of the candidates is found acceptable, or if the work of the TPA is unsatisfactory at any time, the Government may request that CLIPPER supply additional candidates. The Government reserves the right to reject any proposed TPA. All work performed by the TPA and its auditors must be certified as being accurate and truthful. The certification shall be made with the understanding that any false information knowingly submitted is subject to prosecution under 18 U.S.C. § 1001.

(2)     Qualifications. Qualified candidates for the TPA include individuals or firms that have staff capable of applying the most current International Standards Organization ("ISO") 14000 environmental management auditing criteria and have the following experience, expertise, and capabilities:

(a)     expertise and competence in the regulatory programs under United States and other Marine Environmental Protection Requirements (*i.e.*, the International Convention for Prevention of Pollution from Ships (MARPOL), the Act to Prevent Pollution from Ships, the Clean Water Act, and the Oil Pollution Act of 1990);

(b)     experience in performing environmental audits in industrial or maritime environments, and;

(c)     sufficient expertise and competence to assess whether DWM has adequate policies, procedures, and equipment in place to ensure compliance with this ECP and to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance.

(3)     Adequacy of Staff. The TPA must have adequate staff to perform the work required of this ECP. Due to the in-depth nature of the audit criteria, persons with specialized knowledge and experience will be required to perform the audits. The knowledge, skills and abilities of the TPA and staff must align with the criteria of the audits. Experienced personnel with extensive operational, maintenance and repair of shipboard and machinery space systems, equipment, and components is a prerequisite. The TPA shall employ at least one senior level

Marine Engineer (Chief or Second Engineer) to perform shipboard machinery space audits, or they must have an equivalent level of vessel inspection experience. The TPA shall provide the Government with the resumes of the TPA's auditors assigned to conduct shore-side and vessel audits.

(4)     Contractual Independence. During the term of probation, the TPA shall not directly own any stock in CLIPPER or the company(s) that operate or manage the Covered Vessels; must have no other ongoing contractual or business relationship, other than that of the TPA, with CLIPPER; and may not seek or serve in other capacities with CLIPPER or the company(s) that operate or manage the Covered Vessels, unless first disclosed to the Government, the Court, and the CAM, and unless expressly approved by the Government. The TPA must exercise independent judgment and ensure that the objectives set forth in this ECP are met. CLIPPER and the TPA shall notify the Government if any contractual relationships or proposed contractual relationships between CLIPPER and the company(s) that operate or manage the Covered Vessels TPA arise during the term of probation.

(5)     Functional Independence. The TPA shall function independently of CLIPPER and the company(s) that operate or manage the Covered Vessels but may communicate with CLIPPER and the company(s) that operate or manage the Covered Vessels about the substance of its work. At its discretion, the TPA may share with CLIPPER and the company(s) that operate or manage the Covered Vessels its audit checklist. The TPA may consult with, but shall not receive or request approval of any form from any employee of CLIPPER or the company(s) that operate or manage the Covered Vessels regarding the development, clearance, or evaluation of any document, report, or communication of any kind, whether draft or final, required by this ECP.

## E.     ENVIRONMENTAL MANAGEMENT SYSTEM

(1)     CLIPPER has submitted to the government an extensive Environmental Management System ("EMS"), and associated policies, that are used by the company that operates the *M/T CLIPPER SATURN*. The audits to be performed pursuant to this ECP shall conducted on the Covered Vessels based on the standards that currently exist in the EMS and associated policies. If the TPA finds that the EMS and associated policies need updating or changes to ensure compliance with international, United States' and domestic law, the TPA shall forward the suggested changes to the CM and the Interested Parties.

## F.     COURT APPOINTED MONITOR

(1)     As part of the ECP, CLIPPER agrees to pay for a CAM that will report to the Court and the United States during the entire period of probation. Within sixty (60) days of sentencing, DWM will submit a list of three qualified candidates for the CAM from which the United States will select one of the candidates. In the event that the United States does not find one of the candidates satisfactory, it may request CLIPPER to supply additional candidates. Further, if an agreement cannot be reached regarding the selection, the decision shall be left up to the Court. Qualified candidates for the CAM position must have expertise and competence in the regulatory programs under U.S. and international environmental laws, and have expertise and competence in waste stream evaluation, monitoring and control technologies, with a primary

emphasis on engine room and machinery space operations, used by CLIPPER and the company(s) that operate or manage the Covered Vessels to achieve and maintain compliance in respect to Covered Vessels. The CAM shall also have sufficient expertise and competence to assess whether CLIPPER and the company(s) that operate or manage the Covered Vessels has an adequate EMS in place to assess regulatory and ECP compliance, to correct non-compliance, and to prevent future non-compliance.

(2)     The CAM must not directly own any stock in CLIPPER or the company(s) that operate or manage the Covered Vessels, any of their subsidiaries, affiliated business entities and must have no other direct financial stake in the outcome of duties conducted pursuant to this ECP. The CAM must be capable of exercising the same independent judgment and discipline that a certified public accounting firm would be expected to exercise in auditing a publicly held corporation. If CLIPPER or the company(s) that operate or manage the Covered Vessels has any other contractual relationship with the CAM, both CLIPPER and the CAM shall disclose to the United States such past or existing contractual relationships.

(3)     If the United States determines that the proposed CAM does not reasonably meet the qualifications set forth in the previous paragraphs, or that past or existing relationships with the CAM would affect the CAM's ability to exercise the independent judgment and discipline required to conduct the ECP review and evaluation, such CAM shall be disapproved and another CAM shall be proposed by CLIPPER within thirty (30) days of CLIPPER's receipt of the United States' disapproval.

(4)     The TPA and CAM can be the same person/company for this ECP.

## G.     THE AUDITS

(1)     During the first two (2) years of probation, the TPA shall audit the Covered Vessels while the vessels are underway, to the maximum extent practicable. These audits should take place on voyages of short duration (1-3 days) to the maximum extent practicable and the TPA shall adhere to all policies and procedures concerning vessel boardings by third parties, including procedures concerning the prevention of COVID-19 infection or implemented in response to similar extenuating circumstances and/or Acts of God. The CM and TPA shall coordinate the audits to accommodate, as much as practicable, the Covered Vessels' operations and schedule. The audits shall be performed to ascertain and evaluate: their systems, equipment and components; current practices whether documented or not; and the knowledge, skills, and abilities of ship and shore side personnel as they relate to the requirements of this ECP, and other applicable Maritime Environmental Protection Requirements. The audits of the Covered Vessels during the third and fourth years of probation are described below in Section I.

(2)     The audits performed pursuant to this ECP shall exceed a typical ISM Code Safety Management System ("SMS") audit in scope and will be used to determine practices, procedures and equipment conditions not typically documented during a routine inspection by the classification society, port or flag state. The results of the audits will be used to shape and revise the EMS.

(3)     The audits shall meet the following specific requirements:

6

(a)    It shall assess all waste streams developed from any system, equipment and components found in each machinery space on board the Covered Vessels. This will include observation and documentation describing the status and quantity of leakages apparent on each system that can contribute to bilge loading. The audit will determine the status and quantify leakages stemming from:

      i.    all pump and valve seals and glands during operation,
      ii.    all piping systems, flanges, gaskets, fittings and joints,
      iii.    all equipment casings such as main and auxiliary engines, and reduction gears,
      iv.    operation of engines, boilers, incinerators, and evaporators, and
      v.    all other mechanical components found aboard the Covered Vessels.

(b)    It shall assess the adequacy and performance of the Oily Water Separator ("OWS") and Incinerator, Sewage System, and any other pollution prevention equipment to handle the quantities and types of wastes developed during normal operations. To assess the performance of the OWS, the TPA shall conduct an operational test using the normal tank or bilge well supply as would be used in normal operations. The supply tank or bilge well must not be diluted. It will include an evaluation of the capacities for all tanks or containers associated with the management of sludge, bilges and oily wastes or other wastes. It will include an evaluation of documentation tracking, maintenance and repair, and modifications of all pollution prevention equipment, and notification of equipment failure to the CM, CAM, and other shore side personnel.

(c)    It shall assess the ability of crew on each Covered Vessel to handle the operational, maintenance, and repair workloads in maintaining all systems, equipment, and components onboard in order to minimize waste stream development to as low as reasonably practical.

(d)    It shall assess the adequacy of the policy, procedures, current practices and equipment, including storage capabilities used to manage shipboard solid wastes generated in all areas of the vessel and the effectiveness of garbage management plans.

(e)    It shall assess the adequacy of each vessel's responsible crewmembers to maintain the following records, if applicable, and shall include a complete comparative analysis (against each other where possible) of the following records:

      i.    Oil Record Book,
      ii.    Engine Room Alarms,
      iii.    Tank sounding logs (if vessel does not maintain such a log, it must start),

    iv.    Personal work records and lists related to pollution prevention equipment,

    v.    Maintenance records related to pollution prevention equipment,

    vi.    Vendor service records related to pollution prevention equipment,

    vii.    Bilge waste and sludge receipts,

    viii.    Deck Log,

    ix.    Garbage Record Book,

    x.    Oil to Sea Equipment Interface Logs,

    xi.    Hazardous waste manifests,

    xii.    Solid waste discharge receipts,

    xiii.    Oil Content Monitor ("OCM") calibration logs or annual surveys by the makers,

    xiv.    Training records related to pollution prevention,

    xv.    Inspection Documents, and

    xvi.    SMS Audit documents.

(f)    It shall assess the adequacy of the policy, procedures, and current practices used to store and dispose of:

    i.    Solvents,

    ii.    Degreasers,

    iii.    Cleaning wastes,

    iv.    Batteries,

    v.    Paints,

    vi.    Oily rags,

    vii.    Fluorescent and incandescent bulbs,

    viii.    Expired boiler and engine chemicals,

    ix.    Used boiler and engine chemicals,

    x.    Galley greases,

    xi.    Pyrotechnics,

    xii.    Medical supplies,

    xiii.    Contaminate fuels,

    xiv.    Used Oil and greases,

    xv.    Incinerator ash,

    xvi.    Transformer oils, and

    xvii.    Contaminated refrigerants.

(g)    It shall assess and evaluate documentation containing the certifications that each Covered Vessel's officers understand the requirements of this ECP and shall require signed statements by all vessel officers attesting that they understand false entries in the Oil Record Book for machinery space operations is a violation of law.

(h)    It shall assess the policy, procedures, and current practices associated with the Master and Chief Engineer's capability to communicate with shore side personnel, including the CM and designated persons, and shall review such communications.

(i)     It shall assess the frequency and adequacy of, through interviews of crewmembers, shipboard pollution prevention and environmental protection meetings and training.

(j)     It shall assess the policy, procedures, and current practices used on Covered Vessels and ashore to track crewmember environmental training, as well as the availability of and access to training resources.

(k)     It shall assess the adequacy of existing methods for employees to report environmental concerns and evaluate the capability of a reporting individual to remain anonymous, and review processes of handling environmental complaints from crewmembers and shore side personnel.

(l)     It shall assess the policy, procedures, and current practices to ensure that vessel vendors, technicians, and other non-crewmembers who are boarding and/or sailing with the Covered Vessels follow all requirements regarding pollution prevention and environmental protection.

(m)    It shall assess the policy, procedures, and current practices used to manage the existing seal tracking and valve locking program, including the storage of seals and preventing the use of duplicate seals.

(n)     It shall assess the policy, procedures, current practices, and equipment used to maintain refrigeration units, including availability and status of refrigerant recovery units, procedures for recovering refrigerants, and maintenance of a leak log.

(o)     It shall assess the policy, procedures, current practices, and equipment related to Oil Transfer Procedures, including slops discharges, conditions of hoses, connections and transfer equipment.

(p)     It shall assess the policy, procedures, current practices, and equipment used to handle emergency releases of hazardous fluids or pollutants within machinery spaces of vessels, including a review of the shipboard oil pollution emergency plans and evaluation of personnel performing such duties.

(q)     It shall assess the policy, procedures, and current practices associated with ballast water management and invasive species requirements.

(4)     Audit findings should include Observations, Non-Conformities, and Major Non-Conformities, defined as follows:

(a)     Observation, which means a statement of fact made during an audit and substantiated by objective evidence that could lead to a Non-Conformity if not addressed.  A single allegation that equipment was not used in accordance with documented procedures would constitute an Observation in the absence of evidence to the contrary.  This would include pollution

9

prevention equipment that requires a repair of any kind to become operational.

(b)  Non-Conformity, which means an observed situation where objective evidence indicates a violation of a Marine Environmental Protection Requirement or a policy established by this ECP, regardless of whether it is immediately repaired or remedied.

(c)  Major Non-Conformity, which means an observed situation where objective evidence indicates a violation of a Marine Environmental Protection Requirement or policies established by this ECP that consists of or contributes to the discharge or potential discharge of oil, or oily wastes, or other prohibited wastes into the water. It may also include the discovery of pollution prevention equipment determined to be incapable of processing and/or monitoring waste or inadequate with respect to the quantities of wastes such equipment is required to process.

(5)  At the conclusion of the first year of probation, the TPA shall prepare a Report of Findings. If the TPA believes that additional time is needed to analyze available information, or to gather additional information, or to complete the Report of Findings, the TPA may request such additional time, as required, which request shall not be unreasonably denied. If necessary, the Government may grant additional time in thirty (30) day increments for completion of the Report of Findings. CLIPPER will have thirty (30) days to provide comments to the TPA on the Report of Findings. Thereafter, the final Report of Findings shall be provided to the CM, CLIPPER, the CAM, and the Interested Parties.

(6)  The CAM shall be assigned the following tasks and responsibilities and provide written submissions to the Court as set forth below:

(a)  Conduct a review and submit an Annual Report to the Interested Parties and DWM regarding each of the audits conducted pursuant to the ECP. The CAM's Annual Report shall provide a summary of the findings regarding the adequacy of any audits required by this ECP and adequacy of recommendations for change, as found necessary.

(b)  The Annual Report shall also include and address any other information that the CAM is aware of which pertains to DWM's capabilities to meet the objectives of this ECP or any other Marine Environmental Protection Requirements.

(7)  If the CAM receives information regarding a direct violation of any applicable existing Marine Environmental Protection Requirement or requirement of this ECP, the CAM must immediately report the occurrence to the Interested Parties and CM.

(8)  The CAM shall provide any additional reports, in both electronic and hard copy form, to the Interested Parties and CM as requested by the Court or as appropriate and to include inadequacies in the audit process, violations of the terms and conditions of the ECP and EMS and any other findings of significant problems or deficiencies.

10

(9)     At least one audit for each Covered Vessel performed by the TPA shall take place during an underway voyage to the maximum extent possible since that is the best way for auditors to observe ship operations and personnel.  As set forth herein, the TPA shall conduct underway audits during voyages of short duration (1-3 days) to the maximum extent practical.  If this is found impractical within the specified timeframe, then the CM or TPA may conduct the audit when the vessel is in port.  The TPA and CM should communicate frequently regarding ship movements so that the TPA can plan accordingly.

## H.     FINAL EMS/ECP COMPLIANCE AUDIT

(1)     Beginning no later than thirty (24) months from the date of sentencing, CLIPPER shall arrange for, fund and complete a Final EMS/ECP Compliance Audit for the Covered Vessels.  These audits should take place on voyages of short duration (1-3 days) to the maximum extent practical and the TPA shall adhere to all policies and procedures concerning vessel boardings by third parties, including procedures concerning the prevention of COVID-19 infection or implemented in response to similar extenuating circumstances and/or acts of God.  The audits are to be conducted to verify compliance with applicable environmental laws and regulations and the requirements of this EMS and ECP.  During this final audit phase CLIPPER shall immediately advise the Interested Parties of any issue that comes to its attention that adversely impacts CLIPPER's compliance with all applicable laws and regulations and the EMS/ECP.

(2)     The Final EMS/ECP Compliance Audits shall be conducted, as much as is practicable under the circumstances, in accordance with the principles set forth in ISO 9000 and ISO 14011, using ISO 14012 as supplemental guidance, and shall assess conformance with all requirements presented in the EMS and with the additional requirements of this ECP.  Designated United States representatives may participate in the audits as observers at Government expense.  CLIPPER shall make timely notification to the United States regarding audit scheduling in order to make arrangements for observers to be present.

(3)     The TPA shall deliver each vessel's and facility's Audit Report to the CM upon completion.  The CM will then have thirty (30) days to provide comments to the TPA on each Audit Report.  In addition, thereafter, the TPA will deliver the Audit Report to the Interested Parties upon finalizing the Audit Report.  If the TPA believes that additional time is needed to analyze available information or to gather additional information, the TPA may request such additional time as needed to prepare and submit the Audit Report.  If necessary, the Government may grant additional time in thirty (30) day increments for completion of the Audit Report.

(4)     The Final EMS/ECP Compliance Audit Reports shall present the Audit Findings and shall, at a minimum, contain the following information:

(a)     Audit scope, including the time period covered by the audit;

(b)     The date(s) the on-site portion of the audit was conducted;

(c)     Identification of the audit team members;

(d)     Identification of the company representatives and regulatory personnel (if any) observing the audit;

(e)     The distribution list for the Final EMS/ECP Compliance Audit Report;

(f)     A summary of the audit process, including any obstacles encountered;

(g)     Detailed Audit Findings, including the basis for each finding and the Area of Concern identified;

(h)     Identification of any Audit Findings corrected, or Areas of Concern addressed during the audit, and a description of the corrective measures and when they were implemented;

(i)     Certification by the TPA that the Final EMS/ECP Compliance Audit was conducted in accordance with this ECP and general audit principles.

(5)     Within sixty (60) days from completion of the Final EMS/ECP Compliance Audit of a Covered Vessel, CLIPPER shall develop and submit to the Interested Parties, for review and comment, an Action Plan to address audit findings to the extent not already completed. The Action Plan shall include the result of any root-cause analysis, specific deliverables, responsibility assignments, and an implementation schedule. CLIPPER may request that the United States permit a brief extension of the time limit stated above on a case by case basis. Such permission shall not be unreasonably withheld.

(6)     The Action Plan shall be reviewed by the Interested Parties, which shall provide written comments within thirty (30) days of receipt. After making any necessary modifications to the Action Plan based on the comments, CLIPPER shall implement the Action Plan in accordance with the schedules set forth therein. Within thirty (30) days after all items in the Action Plan have been completed, CLIPPER shall submit a written Action Plan Completion Confirmation to the Interested Parties.

## I.    CM/VESSEL MASTER RESPONSIBILITIES

The Master of any Covered Vessel shall ensure that timely reports are made to the CM of any non-complaint condition on a Covered Vessel. The CM shall ensure that timely reports are made to the Interested Parties of any non-compliant condition on a Covered Vessel. CLIPPER shall ensure that the company(s) that operate or manage the Covered Vessels incorporate compliance with the ECP, ISM Code, MARPOL, and all applicable State and Federal safety and environmental statutes and regulations into its current personnel appraisal forms, stressing that compliance therewith is a positive factor and failure to comply is a negative factor in such evaluations.

## J.    TRAINING REQUIREMENTS

(1)     The CM will be responsible for overseeing the development and/or augmentation of training programs to educate and train crew members on Covered Vessels.

12

(2)     Training shall occur annually for all employees and be performed by qualified instructors before an employee assumes his or her duties on a Covered Vessel. The training shall consist of pertinent sections of this ECP, the EMS, and existing Marine Environmental Protection Requirements. The training shall include shipboard-related technical and practical information associated with pollution prevention and the operation, maintenance and repair of pollution prevention equipment and systems, and be appropriate for the work responsibilities and department in which an employee works.

(3)     A basic initial training program shall be provided to Covered Vessels employees currently onboard vessels in an effort to promptly mitigate pollution risk and ensure environmental protection. Additionally, employees must receive shore side training prior to returning to a Covered Vessel on a new contract.

(4)     The training shall include instruction regarding:

(a)     Corporate environmental compliance structure, including the CM and contact information.

(b)     Comprehensive overview of this ECP, the EMS, and other Marine Environmental Protection Requirements.

(c)     The reporting system used to report non-compliance.

(d)     Sanctions and consequences for violations such as remedial training, suspension, termination, and civil and criminal liability.

(e)     Pollution prevention and minimization programs specifically relating to steward, deck, and engine department procedures and operations.

(f)     All requirements set forth in the Engineering section of this ECP.

(g)     Position specific training in the operation, maintenance and repair of OWSs, OCMs, incinerators, and other pollution prevention equipment.

(h)     Procedures for solid and hazardous waste segregation and storage, disposal, and reporting of releases.

(i)     All other shipboard environmental protection related procedures examined and described in the required initial review.

(5)     All new crewmembers reporting to work onboard Covered Vessels shall receive this training prior to beginning to work on board the vessel. It shall be sufficient for the training to be via an interactive online platform, such as Zoom, WebEx, Microsoft Teams, or to administer other computer-based training. The CM shall maintain documentation relating to pre-boarding training onboard the relevant Covered Vessel. Such documentation shall be made available to the TPA, CAM, and the Interested Parties upon request.

**K.    ENGINEERING REQUIREMENTS**

(1)    In addition to the requirements set forth in the EMS and associated policies, the following addition requirements must be implemented on the Covered Vessels.

(2)    Tank Sounding Records

(a)    The CM shall provide each Covered Vessel with a standard format tank sounding log that includes, for each sludge tank, and bilge tank associated with bilge water and/or oil residues (sludge), the tank name/designation, tank capacity, sounded quantity and time and method of sounding. Soundings from each tank shall be taken at least daily. The individual taking the tank sounding shall make entries in the tank sounding log and sign each entry. The Sounding Log must be paginated and contained within a hard-bound book.

(3)    Fleet Engineering Survey

(a)    Within six (6) months of the date of sentencing, the CM shall issue a survey to all shipboard senior engineering officers on the Covered Vessels for information on how to improve MARPOL compliance, to include what new equipment, maintenance, parts, and procedures would be beneficial. This survey shall include a request for the frank opinions of the vessels' engineers as to their ability to adequately maintain the vessels' systems, equipment, and components will be included. The survey will emphasize non-retaliation for open and honest opinions and reports of current noncompliant or unsatisfactory circumstances.

(b)    The CM shall evaluate the responses and establish a plan to evaluate, test, and implement viable ideas for improvement. The CM shall also address, to the extent practicable, legitimate maintenance concerns suggested by the vessels' engineers.

(c)    A summary of the reported information and corrective actions will be provided to the Interested Parties, the CAM, and the TPA.

**L.    DOCUMENTATION AVAILABLE FOR INSPECTION**

The CM shall ensure that all documentation required by this ECP is maintained and available for inspection by the TPA and CAM and the Interested Parties. The Master of each Covered Vessel under this ECP shall maintain on board the vessel all records required by International conventions and treaties including SOLAS, the ISM Code, and MARPOL and applicable state and Federal statutes and regulations and any additional documents required under this ECP, such as crew training records, and will make these records available to the TPA and CAM and the Interested Parties upon request. A summary of this information and any explanation, where appropriate, shall be included in the reports to be submitted to the Interested Parties by the TPA.

## M.   SELF-ENFORCEMENT

CLIPPER further agrees that it will undertake and implement the necessary procedures to ensure that this ECP is diligently complied with.

## N.   REVISIONS/MODIFICATIONS

(a)   The requirements of this ECP, including the dates and time periods mentioned herein, shall be strictly complied with. Any proposed modifications to this ECP must be submitted to the Interested Parties in writing and must be signed by the CM on behalf of CLIPPER. Upon receipt of a proposed modification, each Interested Party shall have thirty (30) days to provide written comments on the proposal.

(b)   If the Interested Parties do not comment on any proposed modification within the time periods set forth in Sections P(a)-(b) above, the requested modification will become effective. If an objection is made in writing within the applicable time period, and DWM and the Interested Parties are unable to resolve the issue, either DWM or the Government may file a motion before the United States District Court for the Eastern District of Virginia.

## O.   REPORTS

All reports, documents and correspondence required under this ECP to be sent to the United States shall be sent to the following offices:

(a)   U.S. Department of Justice
Environmental Crimes Section
Attn: Kenneth E. Nelson
150 M Street, NE, Suite 4.120, Washington, D.C. 20002
Email: Kenneth.Nelson3@usdoj.gov

(b)   U.S. Attorney's Office
Southern District of Texas
Attn: Steven Schammal
1000 Louisiana St., Ste. 2300, Houston, TX 77002
Email: SSchammel@usa.doj.gov

(c)   U.S. Coast Guard Commandant (CG-INV-1)
Office of Casualty Investigations & Analysis
Attn: Designated Representative of the U.S. Coast Guard
2703 Martin Luther King Jr. Ave, SE, Stop 7501
Washington, D.C. 20593-7501
Email: HQS-SMB-CG-INV-ECP@uscg.mil (less than 10GB)

(d)   U.S. Probation Office
Southern District of Texas
515 Rusk St.
Unit 2301
Houston, TX 77002

15